# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Casey Mitchell Tresise,<br><br>               Plaintiff,<br><br>v.<br><br>Nancy A. Berryhill, Acting Commissioner<br>of Social Security,<br><br>               Defendant. | Case No. 16-cv-3814 (HB)<br><br><br><br>**ORDER** |

James H. Greeman, Greeman Toomey, 250 Marquette Avenue, Suite 1380, Minneapolis, MN 55401, for Plaintiff Casey Mitchell Tresise

Pamela Marentette, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendant Nancy A. Berryhill

---

HILDY BOWBEER, United States Magistrate Judge[1]

Pursuant to 42 U.S.C. § 405(g), Plaintiff Casey Mitchell Tresise seeks judicial review of a final decision by the Acting Commissioner of Social Security denying his application for social security disability insurance (DIB) and supplemental security income (SSI). The matter is now before the Court on the parties' cross-motions for summary judgment [Doc. Nos. 11, 17]. As set forth fully below, the Court grants in part and denies in part Tresise's motion for summary judgment, denies the Government's

---

[1] The parties have consented to have a United States Magistrate Judge conduct all proceedings in this case, including the entry of final judgment.

motion for summary judgment, and will remand the matter to the Social Security

Administration for further proceedings consistent with this Order.

## I.    Procedural Background

Tresise applied for DIB and SSI benefits on February 8, 2013, alleging a disability

which began on January 15, 2009.  (R. 13.)  His applications were denied initially on

August 1, 2013, and were again denied after reconsideration on March 12, 2014.  (*Id.*)

Tresise then requested a hearing to review the denial of his benefit claims.  (*Id*.)  An

administrative law judge (ALJ) convened a hearing on March 12, 2015, at which

vocational expert Beverly Solyntejis testified.  (*Id*.)  At Tresise's request, a supplemental

hearing was later held on May 18, 2015 to determine whether jobs suitable for Tresise

existed in the national economy; vocational expert Jessie Ogren testified at that hearing.

(R. 75.)  Assessing Tresise's claims under the five-step sequential evaluation procedure

outlined in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the ALJ determined that

Tresise was not disabled within the meaning of the Social Security Act.  (R. 13-21.)

At step one, the ALJ determined that Tresise had not engaged in substantial

gainful activity since the alleged onset date of January 15, 2009.  (R. 15.)  At step two,

the ALJ determined that Tresise had severe impairments from chronic obstructive

pulmonary disease and alcohol abuse.  (R. 16.)  The ALJ found at the third step, however,

that no impairment or combination of impairments met or equaled the severity of an

impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.  (*Id*.)  At step four, the

ALJ determined that Tresise retained the residual functional capacity (RFC) to perform

light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b).  (R. 17.)  More

specifically, the ALJ found that Tresise's health limitations confine him to work that involves carrying no more than 20 pounds occasionally and up to 10 pounds frequently, standing or walking no more than six hours in an eight-hour day, and sitting up to six hours in an eight-hour day. (*Id.*) Additionally, the ALJ found that Tresise can occasionally use ramps or stairs and is able to balance, reach overhead, stoop, kneel or crouch, but cannot crawl or climb ladders, ropes or scaffolds. (*Id.*) Tresise's respiratory limitations further require that he avoid exposure to extreme heat, extreme cold, humidity, fumes, dust, gases and smoke. (*Id.*) Based on these limitations, the ALJ concluded that Tresise could not perform his past job as an asbestos removal supervisor but could make a successful adjustment to work as an assembler, collator operator, inserting-machine operator, hand packager, or inserter. (R. 19-21.) Therefore, because Tresise was able to work in certain positions available in the American economy, the ALJ determined at step five that Tresise is not disabled. (R. 20.)

Tresise requested the Appeals Council review the ALJ's adverse decision. (R. 1.) In that request, Tresise submitted new evidence from Abbott Northwestern Hospital pertaining to shoulder repair surgery he underwent on July 30, 2015 – a few weeks before the ALJ rendered his decision on August 18, 2015. (R. 4, 559-577.) After reviewing the request, the Appeals Council found no reason under its rules to review the ALJ decision and denied Tresise's request. (R. 1.) Notably, the records submitted to the Appeals Council were not available to the ALJ at the time his decision was rendered, meaning the ALJ's decision was not informed by the most recent medical records pertaining to Tresise's shoulder. *See* (Pl.'s Mem. Supp. Summ. J. at 14 n. 4. [Doc. No. 10].)

Tresise then initiated this action for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Tresise contends the ALJ erred when he failed to identify several severe impairments, contrary to substantial evidence, which resulted in a RFC assessment that significantly overstates the type of work Tresise is capable of performing. (Pl.'s Mem. Supp. Summ. J. at 9.) Tresise submits the ALJ also erred in assessing his RFC. According to Tresise, an appropriate RFC assessment would have included the severe impairments of gout, neuropathy, and left shoulder rotator cuff tear with severe joint arthritis. (*Id.*) Incorporating those limitations, Tresise asserts his RFC assessment would have precluded light work and resulted in a finding of disability due to Tresise's advanced age. (*Id.*)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision. 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Davidson v. Astrue*, 578 F.3d 838, 841 (8th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389 (1971)), meaning that less than a preponderance of the evidence is needed to meet the standard. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). The Court must examine "evidence that

4

detracts from the Commissioner's decision as well as evidence that supports it." *Id.*
(citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).  The Court may not reverse the
ALJ's decision simply because substantial evidence would support a different outcome or
the Court would have decided the case differently.  *Id.* (citing *Woolf v. Shalala*, 3 F.3d
1210, 1213 (8th Cir. 1993)).  Thus, if it is possible to reach two inconsistent positions
from the evidence and one of those positions is that of the Commissioner, the Court must
affirm the decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden to prove disability.  *See Roth v. Shalala*, 45 F.3d 279,
282 (8th Cir. 1995).  To meet the definition of disability for DIB purposes, the claimant
must establish that he is unable "to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for a continuous period of
not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The same standard applies to SSI
claims.  *See* 42 U.S.C. § 1382c(a)(3)(A).  The disability, not just the impairment, must
have lasted or be expected to last for at least twelve months.  *Titus v. Sullivan*, 4 F.3d
590, 594 (8th Cir. 1993).

In reviewing the Commissioner's denial of a disability claim, the Court assesses
whether the disability determination is supported by substantial evidence at each step of
the Commissioner's five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520,
416.920.  At the first step, the Commissioner determines if the claimant is working, *i.e.*
"engaging in substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i),
416.920(a)(4)(i).  If the claimant is engaging in substantial gainful activity, he is not

5

disabled and the analysis ends there. 20 C.F.R. §§ 404.1520(b), 416.920(b). At step two, the Commissioner assesses whether the claimant has a medically determinable impairment that is "severe," meaning it limits his ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant's impairment or set of impairments are not severe, the claimant is not disabled. *Id.* At step three, the Commissioner determines whether the claimant's impairment qualifies as a "listed impairment," 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv), *i.e.* an impairment that *per se* qualifies a claimant for disability. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not listed, however, the ALJ then proceeds to assess the claimant's RFC based on "all the relevant medical and other evidence in [the] record." 20 C.F.R. §§ 404.1520(e), 416.920(e). At step four, the Commissioner considers the claimant's RFC and determines if the claimant is able to meet the demands of the job he or she held prior to the outset of the impairment. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the claimant is capable of working in his former job, the claimant is not disabled. *Id.*

Lastly, at step five, the Commissioner assesses whether the claimant is able to adjust to any other work, taking into account his RFC, age, education and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant is able to do other work, she is not disabled. 20 C.F.R. §§ 404.1520(g), 416.920(g). Unlike the previous steps where the claimant has the burden of proof, at this last step the Commissioner has the burden of proving the claimant is not disabled due to the availability of other work. 20 C.F.R. §§ 404.1512(b)(3), 416.912(b)(3). In particular, the ALJ must show that other work exists in significant numbers in the national economy that

6

the claimant can do the work given his RFC, age, education, and work experience.  20

C.F.R. §§ 404.1512(b)(3), 416.912(b)(3).

## III.  Discussion

### A.  Whether the ALJ Erred in Determining Tresise's Severe Impairments

Tresise argues that the ALJ erred at step two by failing to identify Tresise's

neuropathy, gout, torn left rotator cuff and shoulder arthritis as severe impairments.

(Pl.'s Mem. Supp. Summ. J. at 10-12.)  In making a disability determination, the

Commissioner must consider the medical severity of a claimant's health conditions to

determine if any impairment or combination of impairments limits her ability to do basic

work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  To rise to the level of "severe,"

the impairment must have lasted or be expected to last for a continuous period of at least

12 months.  20 C.F.R. §§ 404.1509, 416.909.  The claimant's burden to demonstrate a

severe impairment is not great; a disability claim may be terminated at step two "only

when the claimant's impairment or combination of impairments would have no more than

a minimal impact on her ability to work."  *Caviness v. Massanari*, 250 F.3d 603, 605 (8th

Cir. 2001).  Here, the ALJ determined Tresise suffered from two severe impairments:

alcohol abuse and chronic obstructive pulmonary disease.  (R. 16.)  All other alleged

impairments were not severe, according to the ALJ, because they have either been well

managed by treatment, have lasted less than a year, lacked formal diagnosis by a medical

source, or did not significantly impact his ability to work.  (*Id.*)  Tresise argues the ALJ's

decision to reject his other claimed severe impairments at step two was not supported by

substantial evidence given the strength of the record supporting those claims.

7

Tresise specifically argues that the ALJ erred when he acknowledged Tresise had been diagnosed with sensorimotor polyneuropathy in February 2015 but nevertheless determined it was not a severe limitation because it had not lasted for the required 12-month period of time. (R. 16, 524.) Polyneuropathy is a general term for a "disease process involving a number of peripheral nerves." *Stedman's Medical Dictionary* 1536 (28th ed. 2006). Sensorimotor polyneuropathy, then, is a disease affecting nerves in a way which limits their ability to experience sensations or cause muscle fibers to contract. *Id.* at 1229, 1749. Therefore, a person suffering from sensorimotor polyneuropathy may have difficulty walking and experience muscle weakness, numbness or tingling. *See Sprenger v. Fed. Home Loan Bank of Des Moines*, No. 4-99-cv-10055, 2000 WL 33361996, at *4 (S.D. Iowa July 25, 2000) (noting that peripheral neuropathy – another term for sensorimotor neuropathy – can "substantially limit a person's ability to engage in various physical activities"); *see also Potter v. Astrue*, No. 4:10-cv-01120, 2011 WL 2456714, at *3 (E.D. Ark. May 24, 2011). Here, Tresise points to two items in the record to argue the ALJ improperly concluded his neuropathy had lasted for less than one year. Tresise first notes that medical records indicate he had experienced foot numbness dating back to September or October of 2014. (R. 507.) Additionally, Tresise highlights his testimony at the hearing in which he explained that he regularly experienced tingling in his feet which make it difficult for him to walk or stand. (R. 36-37.) In light of the medical record and his testimony, Tresise asserts the ALJ's conclusion regarding his neuropathy is not supported by substantial evidence.

Tresise also argues that the ALJ erred when he indicated that Tresise had suffered from a gout flare in the past, yet concluded that his gout was not a severe impairment because it has been controlled with medication. (R. 16.) Gout is a disorder of the metabolism characterized by raised uric acid levels in the blood, *Stedman's Medical Dictionary* 827 (28th ed. 2006), which can cause "sudden, severe attacks of pain, redness, and tenderness in joints." *Giambrone v. Colvin*, No. 15-CV-05882 (PKC), 2017 WL 1194650, at *1 n.1 (E.D.N.Y. Apr. 3, 2017). Tresise points to various items in the record to show that his gout is severe and has lasted for longer than one year. In particular, Tresise notes he was treated for gout after reporting pain, swelling and tenderness and an inability to bear weight on his right foot in late December 2009. (R. 443.) During a February 2013 visit with his primary care physician, Tresise again reported right foot pain and his doctor ordered a test to check Tresise's uric acid levels, indicating that he believed Tresise to be suffering from gout. (R. 454.) The record also documents acute episodes of gout in October 2013 and April 2014. On October 31, 2013, his primary care physician recorded that Tresise suffered an acute gout episode and also indicated in his notes that Tresise had experienced foot pain throughout the previous winter. (R. 468.) In April 2014, Dr. Kimpell once again reported that Tresise suffered an acute gout episode. (R. 484.) In his 2013 function reports, Tresise complained about foot swelling and pain. (R. 357-58.) At his hearing, Tresise also reported that the pain he experienced in his feet made it difficult for him to walk or stand. (R. 36.) According to Tresise, the medical record paints a clear picture that gout symptoms significantly impact his ability to work

and therefore, the ALJ's failure to include gout as a severe impairment at step two is not supported by substantial evidence.

Lastly, Tresise argues that the ALJ erred when he failed to include, or even to mention, Tresise's rotator cuff tear and left shoulder arthritis at step two. On or about October 1, 2010, Tresise injured his shoulder while trying to lift a trailer. (R. 444.) Tresise then visited Dr. Kaikhushroo Radmanesh at the Allina Clinic in Bloomington and was informed that he may have sustained a partial rotator cuff tear. (R. 446.) Despite the preliminary diagnosis, Tresise did not seek additional treatment for his shoulder at that time. In 2013, Tresise visited Dr. Randy Kimpell who documented that Tresise was experiencing left shoulder pain and that Tresise is unable to use his left shoulder. (R. 482.) In February 2015, Tresise again reported shoulder pain in a visit to the Noran Neurological Clinic. (R. 529.) In April 2015, Tresise sought treatment for his shoulder from Dr. Ghose, an orthopedic surgeon, and was formally diagnosed with a left rotator cuff tear. (R. 553.) Dr. Ghose scheduled surgery on Tresise's left shoulder. (R. 560.) During his preoperative clearance appointment, Dr. Ghose noted Tresise's "longstanding history of left shoulder pain and loss of range of motion." (R. 560.) While performing the rotator cuff repair surgery, Dr. Ghose observed severe degenerative arthritis of the distal clavicle and a full-thickness chronic tear, but was able to do a "side-to-side repair." (R. 577.) Tresise argues these records demonstrate a well-documented and severe shoulder injury that significantly limits Tresise's ability to "do basic work activities." *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

The Commissioner maintains the ALJ properly concluded that Tresise suffered from only two severe impairments, namely, chronic obstructive pulmonary disease and alcohol abuse. However, even if the ALJ should have recognized other severe impairments, the Commissioner asserts the error was harmless. The Commissioner points out that at step two, the ALJ considers only the threshold issue of whether the claimant has one or more severe impairments; the claimant either has one or he does not. *Johnson v. Comm'r of Soc. Sec.*, No. CIV. 11-1268 JRT/SER, 2012 WL 4328413, at *21 (D. Minn. July 11, 2012). If the ALJ finds a claimant has a severe impairment, but improperly omits another condition from the list of severe impairments, the error is harmless so long as the ALJ considers all impairments, both severe and non-severe, when assessing the claimant's RFC. *Bondurant v. Astrue*, No. CIV 09-328 ADM/AJB, 2010 WL 889932, at *2 (D. Minn. Mar. 8, 2010), aff'd, 444 F. App'x 928 (8th Cir. 2011).

The Commissioner argues the ALJ fully considered all of Tresise's impairments when assessing his RFC. With respect to Tresise's gout, the ALJ asked Tresise at the hearing about how his gout manifests and how the condition has responded to medication, to which Tresise replied that his gout causes his feet to swell but he hasn't had a gout flare since beginning his medication. (R. 45.) Regarding Tresise's neuropathy, the Commissioner considered the impairment when indicating in his decision that there is no medical evidence documenting symptoms of his neuropathy prior to his first reporting them in January 2015, less than 12 months prior to the hearing. Lastly, with respect to Tresise's shoulder injury, the Commissioner asserts the ALJ considered the impact of that injury when assessing the RFC because he included limitations in the

RFC that reflected Tresise's limited use of his left shoulder. In particular, the RFC includes limitations on climbing, crawling, light level lifting, and occasional overheard reaching—all shoulder intensive activities. (R. 17.) On these facts, the Commissioner asserts any hypothetical error at step two was harmless, because the ALJ considered all of Tresise's limitations when assessing his RFC.

The Court need not determine whether the ALJ committed error at step two, because the Court finds that any hypothetical error from failing to include gout, neuropathy or shoulder injury in the list of severe impairments at that step was harmless. In *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007), the Eighth Circuit considered whether an adverse disability determination should be reversed based on an ALJ's failure to include a severe impairment at step two of the sequential evaluation. In that case, the district court found numerous severe impairments at step two, but did not include the claimant's diagnosed borderline intellectual functioning among them. *Id.* On appeal, the Eighth Circuit determined that the ALJ erred by not including borderline intellectual functioning among her severe impairments, but reversed on the ground that the ALJ failed to conduct needed tests to develop the record regarding her borderline intellectual functioning, and thus had not fully considered the impairment at later stages in the sequential evaluation. *Id.* Courts in this district have followed the approach set forth in *Nicola* and determined that reversal based on errors at step two is only warranted when

the ALJ fails to consider the omitted impairments in the RFC.  *See, e.g., Lorence v. Astrue*, 691 F.Supp.2d 1008, 1028 (D.Minn.2010).[2]

Here, the ALJ did consider Tresise's neuropathy, gout, and shoulder impairment when assessing the RFC.  For example, the ALJ noted Tresise suffered from gout in his explanation of his RFC assessment, but determined that Tresise's gout did not significantly limit his ability to do basic work activities because Tresise reported working during a gout flare.  (R. 17-18, 443.)  The ALJ stated that Tresise first complained of escalating foot numbness and tingling symptoms in January of 2015, which was later diagnosed by a neurologist as "moderate sensorimotor generalized axonal polyneuropathy."  (R. 18, 524.)  He determined, however, that the neuropathy was mild because Tresise had "normal muscle bulk and tone, mostly normal deep tendon reflexes, and a normal gait."  (R. 18.)  The ALJ additionally noted Tresise's shoulder impairment, but determined that it did not prevent him from working because he continued to work as a painter after suffering the initial injury to his shoulder.  (R. 18.)  Therefore, because the ALJ considered all of Tresise's limitations when assessing the RFC, any potential error at step two of the sequential evaluation procedure was harmless.  The Court will address below, however, whether the ALJ gave sufficient consideration to any functional limitations resulting from these conditions in his RFC assessment.

---

[2] *See also Lund v. Colvin*, No. CIV. 13-113 JSM, 2014 WL 1153508, at *26 (D. Minn. Mar. 21, 2014); *Johnson v. Comm'r of Soc. Sec.*, No. CIV. 11-1268 JRT/SER, 2012 WL 4328413, at *21 (D. Minn. July 11, 2012); *Snyder v. Colvin*, No. CIV. 12-3104 MJD/JJK, 2013 WL 6061335, at *9 (D. Minn. Nov. 18, 2013); *Bondurant v. Astrue*, No. CIV 09-328 ADM/AJB, 2010 WL 889932, at *2 (D. Minn. Mar. 8, 2010), aff'd, 444 F. App'x 928 (8th Cir. 2011)

### B.    Whether the RFC Assessment is Supported by Substantial Evidence

Tresise argues the ALJ improperly assessed his RFC because the ALJ did not fully account for his limited ability to walk and stand.  An RFC assessment is an administrative determination regarding the extent to which a claimant is capable of performing work-related activities given the claimant's impairments.  *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007).  The Commissioner determines the claimant's RFC by conducting "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."  SSR 96-8p, 61 Fed. Reg. 34474-01 (July 2, 1996).  In doing so, the Commissioner considers all of the claimant's impairments, both severe and non-severe.  20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). The assessed residual function capacity, then, provides the basis for the Commissioner to determine which jobs, if any, the claimant is capable of performing.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  To withstand judicial review, the Commissioner's assessment of a claimant's RFC must be supported by substantial evidence.  *Baugus v. Sec'y of Health & Human Servs.*, 717 F.2d 443, 446 (8th Cir. 1983).

Tresise argues the ALJ overstated the basic work activities that Tresise was capable of performing, given the limitations caused by his gout, neuropathy and shoulder impairment.  Specifically, the ALJ determined in his RFC assessment that Tresise had the ability to:

> perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)
> except the claimant can lift or carry up to 20 pounds occasionally and up to
> 10 pounds frequently. The claimant can stand or walk up to 6 hours in an 8-
> hour day, and sit up to 6 hours in an 8-hour day, with normal breaks. The
> claimant cannot climb ladders, ropes, or scaffolds, and he cannot crawl. The

14

claimant can occasionally use ramps or stairs, balance, reach overhead, stoop, kneel, or crouch. The claimant must avoid exposure to extreme heat, extreme cold, and humidity, and must avoid concentrated exposure to irritants such as fumes, dust, gases and smoke.

(R. 17.)  According to Tresise, the ALJ's finding that he is able to walk or stand up to six hours in a work day is not supported by substantial evidence, because the record is replete with evidence that gout and neuropathy significantly limit his ability to walk and stand, yet the ALJ included no limitations reflecting these conditions.

In addition, Tresise argues the ALJ's findings regarding his ability to reach and lift with his arms are not supported by substantial evidence because Tresise's full rotator cuff tear and shoulder arthritis severely limit his ability to use his left arm.  Tresise notes that Dr. Kimpell gave an opinion in February 2013 that Tresise "suffered from [left] shoulder pain" and was "unable to use his [left] shoulder."  (R. 482.)  When Tresise did seek treatment for his left shoulder, orthopedic surgeon Dr. Tilok Ghose diagnosed Tresise with a full-thickness chronic tear with grade three chondromalacic degenerative changes in the humeral head and the glenoid and severe left shoulder joint arthritis.[3] (R. 576.) Despite these indications of Tresise's shoulder limitations, the ALJ found that Tresise is able to occasionally lift and carry objects up to 20 pounds, frequently lift and carry objects up to 10 pounds, and occasionally reach overhead.  (R. 17.)  Further, the ALJ included no limitations in his RFC assessment regarding Tresise's ability to reach with his left arm, and only briefly mentioned that Tresise would experience difficulty lifting

---

[3] Chondoromalacia is a "softening of any cartilage."  *Stedman's Medical Dictionary* 369 (28th Ed. 2006).  The humeral head is the top of the bone in a person's upper arm which fits into the shoulder socket.  *Id.* at 853.  The glenoid is the shoulder socket. *Id.* at 811.

his left arm overhead in the hypotheticals he posed to the vocational experts at the hearings held on March 15, 2015 and May 18, 2015.  (R. 51, 79.)  Accordingly, Tresise argues that his RFC is not supported by substantial evidence.

The Commissioner counters that substantial evidence supports the ALJ's assessment of Tresise's RFC.  The claimant bears the burden to prove disability and demonstrate RFC.  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  Based on that showing, the ALJ must assess the claimant's RFC while taking into account all "relevant evidence, including medical records, observations of treating physicians and others." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir.2007).  Further, the RFC assessed by the ALJ must be supported by substantial evidence.  *Baugus v. Sec'y of Health & Human Servs.*, 717 F.2d 443, 446 (8th Cir. 1983).  The substantial evidence standard, however, does not set a high bar; the ALJ need only demonstrate "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Davidson v. Astrue*, 578 F.3d 838, 841 (8th Cir. 2009).

According to the Commissioner, Tresise's claim that gout and neuropathy limit his ability to stand and walk is *ipse dixit*, because no evidence exists in the record to corroborate that claim.  At most, the Commissioner asserts, Tresise references only the Mayo Clinic website to show that gout can be extremely painful.  (R. 443.)  By contrast, the Commissioner claims, the record provides considerable evidence that Tresise is only mildly impaired by his gout symptoms.  For instance, Tresise reported the symptoms during his first gout flare were not so severe that they prevented him from working.  (R. 443.)  Tresise acknowledged he has not suffered a gout attack since starting medication to

treat his gout in 2014. (R. 45, 484.) His primary physician also noted that Tresise had reported no gout flares while taking his allopurinol medication. (R. 484.)

The Commissioner also argues that medical evidence in the record does not support Tresise's claim that he suffered from neuropathy for a period lasting longer than one year, which is a requirement for an impairment to be considered disabling. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* (R. 507, 524-25, 527). The medical records do indicate, however, that Tresise has "normal muscle bulk, normal muscle tone, intact power and normal gait" despite his neuropathy diagnosis. (R. 527.) Based on these facts, the Commissioner argues that substantial evidence supports the ALJ's assessment that Tresise is able to walk or stand for a period of six hours in a workday.

The Commissioner also asserts that the ALJ properly considered Tresise's left shoulder impairment in his RFC finding. As Tresise acknowledges, the RFC contains limitations with respect to climbing, lifting and overhead reaching, all of which are responsive to Tresise's left shoulder limitations. The Commissioner asserts that Tresise cannot point to medical evidence in the record to indicate that stricter limitations are necessary, *i.e.* that his shoulder injury prevents him from performing the work tasks described in the RFC. Therefore, the Commissioner argues, the ALJ's assessment of the RFC is supported by substantial evidence because it accurately reflects what the record shows regarding his limited ability to use his left shoulder.

Further, the Commissioner argues the ALJ properly discounted the opinion of treating physician Dr. Kimpell that Tresise could not use his left shoulder. (R. 482.) In social security cases, the opinion of a treating physician is generally afforded controlling

17

weight. *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017). If the ALJ assigns less than controlling weight to the opinion of a treating source, "the ALJ must give good reasons for doing so." *Id.* Even if the treating physician opinion is not entitled to controlling weight, it "should not ordinarily be disregarded and is entitled to substantial weight." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir.2000); *see also Samons*, 497 F.3d at 818; 20 C.F.R. §§ 404.1527, 416.927. Here, the Commissioner argues the ALJ appropriately discounted Dr. Kimpell's opinion, while still giving it "some weight," because Dr. Kimpell's opinion is inconsistent with the record. In particular, the ALJ noted that Tresise's "continued work activity, non-compliance, and minimal objective findings diminish the credibility of the claimant's allegations" and undermine the opinions submitted by Dr. Kimpell. (R. 19.)

After careful review of the record, the Court finds the ALJ's conclusions regarding Tresise's gout and neuropathy are supported by substantial evidence. The record indicates that Tresise is able to manage the symptoms of his gout when he takes his medication, thereby diminishing the potential impact the disease has on his daily activity at the workplace. Additionally, the ALJ correctly concluded that his neuropathy symptoms had not lasted for a continuous period of more than a year prior to the disability determination, and thus could not be considered a disabling limitation. Accordingly, the Court finds that a reasonable person could conclude based on the facts in the record that Tresise is able to stand or walk up to six hours in a given eight hour workday. Therefore, the Court finds the portion of the RFC regarding Tresise's ability to stand or walk to be supported by substantial evidence.

The Court finds, however, that the ALJ did err by not appropriately considering the limitations imposed by Tresise's shoulder condition, although the error may have been unavoidable given the sequence of events. (Pl.'s Mem. Supp. Summ. J. at 14 n. 4.) Because Tresise's shoulder surgery took place near the end of the first appeal, it appears the medical records from the surgery were not available to the ALJ at the time he wrote his decision. (R. 4.) Nevertheless, the ALJ's decision must be "supported by substantial evidence on the record as a whole, including the new evidence that was considered by the Appeals Council." *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008). Accordingly, for the reasons articulated below, the Court finds the ALJ failed to account for considerable evidence in the record indicating Tresise has a significantly limited ability to use his left shoulder, and depending on the success of the shoulder surgery, possibly no ability at all.

An ALJ must assess a claimant's RFC "based on all relevant, credible evidence in the record," *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir.2004), and take into account "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). The record evidences that Tresise suffers from a limited ability to use his left shoulder dating back to October of 2010, when Dr. Radmanesh first reported that Tresise's shoulder "hurt exquisitely when he tries to abduct his arm." (R. 444-45.) At that visit, Dr. Radmanesh told Tresise that he may have a partial rotator cuff tear, instructed him not to lift anything weighing heavier than 5 pounds, and referred him to an orthopedic surgeon for a consult. (R. 446.) Although Tresise did not follow up at that point with a visit to an orthopedist,

the injury did not heal with time.  In February 2013, Tresise again complained of

shoulder pain, this time to Dr. Kimpell.  (R. 453.)  In an accompanying medical opinion

form, Dr. Kimpell stated that Tresise was unable to use his left shoulder.  (R. 482.)

Tresise eventually did see orthopedic surgeon Dr. Ghose in April of 2015, who reported

that Tresise presented left should pain and weakness, "moderate to severe aching," and

"discomfort and increased pain with activity" that became worse when "bending or

flexing . . . and turning or rotating."  (R. 551.)  Based on his examination, Dr. Ghose

determined that Tresise suffered from "acromion narrowing [in] the subacromial space

consistent with shoulder impingement syndrome," and diagnosed Tresise with a torn left

rotator cuff.[4]  (R. 554.)  Tresise underwent surgery on July 30, 2015, at which point Dr.

Ghose confirmed Tresise suffered from a full-thickness chronic tear of the left rotator

cuff measuring roughly three centimeters.  (R. 576.)  He also observed degenerative

changes in the shoulder, as well as severe arthritis at the AC joint between the shoulder

blade and the collar bone.  (R. 576-77.)  Dr. Ghose proceeded to conduct a side-to-side

repair of the torn rotator cuff muscle.  (R. 577.)  Afterwards, he put Tresise's shoulder

through a range of motion and noted no instability.  (*Id.*)  The record provides no

---

[4] The acromion is the tip of the shoulder blade that connects to the collar bone at the
acromioclavicular (AC) joint. *Stedman's Medical Dictionary* 19 (28th Ed. 2006).  The
subacromial space is the area beneath the acromion process. *Id.* at 1854.  Shoulder
impingement syndrome occurs when an injury to the rotator cuff occurs, and symptoms
include "difficulty reaching up behind the back, pain when the arms are extended above
the head, and weakness of the shoulder." Cleveland Clinic, *Shoulder Impingement
Syndrome*, Diseases & Conditions (Feb. 23, 2018, 4:20 PM), https://my.clevelandclinic.
org/health/diseases/7079-shoulder-impingement-syndrome.

indication, however, regarding how successful the surgery was, or the degree to which it enabled Tresise to recover some or all of the use of his left shoulder.

In light of these facts, and given the ALJ's limited attention to the shoulder impairment in his adverse disability decision, the Court finds the ALJ did not appropriately account for Tresise's full-thickness rotator cuff tear diagnosis or the medical findings regarding degenerative changes to his shoulder and accompanying arthritis. Rather, the ALJ decision merely noted that a 2010 X-ray of Tresise's left shoulder showed "no acute fracture or dislocation, and the joint space, subacromial space, and alignment were all normal." (R. 18.) But the medical records from the July 2015 surgery clearly demonstrate that Tresise has significant structural issues in his left shoulder. On these facts, the Court finds that a reasonable person would not agree with the ALJ's conclusion that the structural condition of Tresise's shoulder was normal. In light of that error alone, the ALJ's assessment of his functional limitations with respect to his shoulder cannot be upheld. Thus, the Court finds the ALJ's assessment of Tresise's shoulder is not supported by substantial evidence.

Furthermore, the ALJ failed to supply a "good reason" for discounting treating physician Dr. Kimpell's opinion regarding Tresise's left shoulder. Social Security Administration regulations provide that the opinions of a treating physician are entitled to greater weight than other opinions. 20 C.F.R. §§ 404.1527(c), 416.927(c). In fact, a treating physician's opinions are generally afforded controlling weight, and if they are given lesser weight, "the ALJ must give good reasons for doing so." *Chesser*, 858 F.3d at 1164. Even if the treating physician opinion is not entitled to controlling weight, it

21

"should not ordinarily be disregarded and is entitled to substantial weight." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir.2000); *see also Samons*, 497 F.3d at 818; 20 C.F.R. §§ 404.1527, 416.927. Here, the ALJ even acknowledged in the decision that Dr. Kimpell opined that Tresise was unable to use his left shoulder, and further concluded that Dr. Kimpell's opinion was generally supported and entitled to some weight. Yet the ALJ devoted no portion of his opinion to explaining why Dr. Kimpell's conclusions regarding Tresise's shoulder should be disregarded. Instead, the ALJ explained his RFC assessment would depart from Dr. Kimpell's opinions because he did not find the "claimant should be limited to sedentary work due to shortness of breath with exertion." (R. 18.) The ALJ's failure to account adequately for the weight to be given the opinion of Tresise's treating physician provides a further basis for remand.

### C. Whether the ALJ Posed Flawed Hypotheticals to the Vocational Experts

Tresise additionally argues that the ALJ posed flawed hypotheticals to the vocational experts at Tresise's hearings which resulted in incorrect opinions regarding Tresise's ability to successfully transition into different work. "Questions posed to a vocational expert should 'precisely set out the claimant's particular physical and mental impairments.'" *Ledoux v. Schweiker*, 732 F.2d 1385, 1388 (8th Cir.1984) (quoting *Tennant v. Schweiker*, 682 F.2d 707, 711 (8th Cir.1982)). "An expert's testimony based upon an insufficient hypothetical question may not constitute substantial evidence to support a finding of no disability." *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996)

Here, vocational experts Beverly Solyntejis and Jessie Ogren were asked to consider which jobs could be performed by a hypothetical individual capable of light work involving the occasional lifting of 20 pounds, frequent lifting of 10 pounds and occasional overhead reaching.  (R. 51, 79.)  The ALJ additionally described the hypothetical individual as capable of standing and walking for up to six hours in a workday.  (*Id.*)  Based on these characteristics, the vocational experts then determined the hypothetical person would be capable of working as an assembler, collator operator, inserting-machine operator, hand packager, or inserter.  Tresise argues that the opinions of the vocational experts are not supported by substantial evidence because they contained two flaws. First, the hypotheticals asserted an occasional ability to reach overhead which did not account for Tresise's limited ability to use his left shoulder. Second, the hypotheticals indicated an ability to walk or stand up to six hours in a workday, which did not account for the limitations caused by Tresise's gout and neuropathy.  Accordingly, Tresise argues the ALJ's ultimate conclusion regarding Tresise's disability is not supported by substantial evidence, because it relied on vocational expert testimony "based upon an insufficient hypothetical question."  *See Newton*, 92 F.3d at 695.

With respect to the portions of the hypotheticals posed to the vocational experts regarding Tresise's ability to stand and/or walk up to six hours in an eight hour workday, the Court has already concluded the RFC was supported by substantial evidence.  The hypotheticals accurately recounted the related limitations, and therefore the Court finds that they were supported by substantial evidence.

23

However, in light of the foregoing analysis regarding the ALJ's error with respect to Tresise's shoulder injury in the RFC, the Court finds the hypotheticals posed to the vocational experts were flawed insofar as they did not appropriately account for the extent of Tresise's shoulder limitations. Therefore, the ALJ erred in relying on the resulting testimony, because that testimony cannot constitute substantial evidence. *See Gann v. Berryhill*, 864 F.3d 947, 953 (8th Cir. 2017). The Commissioner correctly points out the hypotheticals posed to the vocational experts tracked with the limitations included in the RFC. But if the underlying RFC overstated Tresise's ability to use his left shoulder, the hypothetical questions posed to the vocational experts must be revised accordingly.

## IV.    Conclusion

In sum, the Court finds that the ALJ's determination of Tresise's RFC was not supported by substantial evidence because he did not account for more recent medical information concerning Tresise's left shoulder injury and function, and he failed to adequately explain why he discounted the treating physician's opinion regarding Tresise's left shoulder. On remand, the record may be further developed regarding the aftermath and ultimate outcome of Tresise's shoulder surgery. While the ALJ's conclusion regarding Tresise's ability to use his left shoulder could ultimately prove correct, the Court finds at this time that the ALJ's determination of Tresise's RFC is not supported by substantial evidence of record. Likewise, the hypotheticals posed by the ALJ to the vocational experts, and opinions voiced in response, may require correction

24

depending upon the results of the ALJ's determination on remand of Tresise's RFC.

Accordingly, based on all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1. Plaintiff Casey Mitchell Tresise's Motion for Summary Judgment [Doc. No. 11] is **GRANTED IN PART** and **DENIED IN PART** for the reason set forth herein;

2. Defendant Nancy A. Berryhill's Motion for Summary Judgment [Doc. No. 17] is **DENIED**;

3. The decision of the Commissioner is **REVERSED**; and

4. This matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this Order, including:

   a. The ALJ shall obtain and consider medical evidence related to Tresise's left shoulder and determine the extent to which his left shoulder impairment prevents him from performing basic work activities, including but not limited to lifting or carrying up to 20 pounds occasionally and up to 10 pounds frequently;

   b. The ALJ shall weigh treating physician Dr. Kimpell's opinions regarding Tresise's left shoulder according to the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c); and

   c. If the RFC assessment changes as a result of the above, the ALJ shall pose a new hypothetical question to a vocational expert and obtain testimony regarding Tresise's ability to perform her past relevant work or other work in the national economy.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: February 26, 2016

_____
       HILDY BOWBEER

United States Magistrate Judge